**In re AMERICAN CONTINENTAL CORPORATION, an Ohio corporation, Debtor.**

**FEDERAL HOME LIFE INSURANCE COMPANY, an Indiana insurance corporation, Movant,**

**v.**

**AMERICAN CONTINENTAL CORPORATION, an Ohio corporation, Debtor/Respondent.**

**Bankruptcy No. B–89–3117–PHX–SSC.**

United States Bankruptcy Court, D. Arizona.

Aug. 14, 1989.

---

Charles Sterbach, Gallagher & Kennedy, Local Counsel, Phoenix, Ariz., James Feder, Wyman, Bautzer, Kuchel & Silbert, Los Angeles, Cal., for debtor.

Jim Grogan, American Continental Corp., Local Counsel, Phoenix, Ariz., for American Continental Corp.

Tamalyn Lewis–Edwards, Ridenour, Swenson, Cleere, & Evans, Phoenix, Ariz., for Federal Home Life Ins. Co.

S. Cary Forrester, Kalish, Forrester & Torres, P.C., Phoenix, Ariz., for FDIC.

Jared G. Parker, Winston & Strawn, Phoenix, Ariz., for American Continental Corporation's Subsidiaries.

### MEMORANDUM DECISION AND ORDER CONCERNING CASH COLLATERAL

SARAH SHARER CURLEY, Bankruptcy Judge.

#### PRELIMINARY STATEMENT

Federal Home Life Insurance Company ("FHLIC") filed a Motion to Vacate the Stay against American Continental Corporation ("ACC"), the Debtor herein.

On May 25, 1989, this Court entered specific findings of fact and conclusions of law concerning the interest of FHLIC in and to the rents generated from the McClintock Fountains Shopping Center, then owned by ACC. This Court has subsequently entered an Order authorizing the sale of the Shopping Center. The sale has not yet closed, although that is anticipated shortly. The parties sought a determination as to

the interest of FHLIC in and to the rental payments, inasmuch as it was anticipated that the Debtor would continue to receive the rents generated from the Shopping Center up to the point of closing.

Although this Court rendered its decision on the record on May 25, 1989, it specifically reserved jurisdiction to reduce its findings of fact and conclusions of law to a written decision and order.

This Court has jurisdiction over this matter, and this is a "core" proceeding pursuant to 28 U.S.C. §§ 1334 and 157. This decision and order shall constitute the formalized and final findings of fact and conclusions of law of this Court pursuant to *Bankruptcy Rule* 7052.

On April 13, 1989, ACC filed its petition under Chapter 11 of the Bankruptcy Code, and continued with its operations in the ordinary course of its business pursuant to 11 U.S.C. § 1107.

On April 17, 1989, FHLIC filed its Motion to Modify the Automatic Stay, so that it could perfect its interest in the rental payments received from the McClintock Fountains Shopping Center, which was owned by ACC. This Motion was filed, according to FHLIC, out of an overabundance of caution, because of the divergent authority amongst the Bankruptcy Judges in the District of Arizona as to how a secured creditor should perfect an interest in rents generated by Arizona real property and whether rents generated by Arizona real property could ever constitute "cash collateral" within the parameters of 11 U.S.C. § 363(a).

On April 17, 1989, FHLIC also filed a Notice of Perfection in the Shopping Center rental payments.

On May 2, 1989, FHLIC filed a Motion to Prohibit the Use of Cash Collateral generated by ACC from its leasing of space to tenants at the McClintock Fountains Shopping Center, and requested that any sale proceeds received from the sale of the Shopping Center also be sequestered.

On May 16, 1989, ACC filed an Objection to FHLIC's Notice of Perfection.

The parties filed a Statement of Stipulated Facts on May 12, 1989, so that this Court might resolve the legal issues presented to it. The facts to which the parties were able to stipulate are set forth below.

### FACTUAL BACKGROUND

On October 27, 1988, FHLIC, as lender, and ACC and Amcor Investments Corporation ("Amcor"), a California corporation and a subsidiary of Lincoln Savings and Loan Association, entered into a Loan Agreement, wherein FHLIC agreed to loan ACC and Amcor the aggregate sum of $25,000,000.00. Eight individual promissory notes (the "Notes") were executed in connection with the Loan Agreement. The Notes are secured by eight individual deeds of trust ("Deeds of Trust") recorded against certain real properties, seven of which are owned by ACC.

FHLIC is the owner and holder of the Notes,[1] which are secured by the Deeds of Trust and the Assignments of Rents.[2]

---

1. The Notes may be described as follows:
   (A) Promissory note dated October 31, 1988, in the original principal sum of $4,170,000.00, and executed by ACC in favor of FHLIC;
   (B) Promissory note dated October 31, 1988, in the original principal sum of $3,750,000.00, and executed by ACC in favor of FHLIC;
   (C) Promissory note dated October 31, 1988, in the original principal sum of $9,564,000.00 and executed by ACC in favor of FHLIC ("McClintock Shopping Center Note");
   (D) Promissory note dated October 31, 1988, in the original principal sum of $2,700,000.00, and executed by ACC in favor of FHLIC;
   (E) Promissory note dated November 30, 1988, in the original principal sum of $1,905,-

872.00, and executed by Amcor in favor of FHLIC;
   (F) Promissory note dated October 31, 1988, in the original principal sum of $1,537,222.00, and executed by ACC in favor of FHLIC;
   (G) Promissory note dated October 31, 1988, in the original principal sum of $622,906.00, and executed by ACC in favor of FHLIC; and
   (H) Promissory note dated October 31, 1988, in the original principal sum of $750,000.00, and executed by ACC in favor of FHLIC.

2. ACC and Amcor Investments Corporation executed the following Deeds of Trust and Assignment of Rents:
   (a) Deed of Trust and Assignment of Rents recorded October 31, 1988 with the Maricopa

There is no dispute as to validity of the liens against the aforesaid real property.

Paragraph 11 of the McClintock Fountains Deed of Trust provides for an assignment of the rents, issues and profits generated by McClintock Fountains Shopping Center as further security for the payment of the indebtedness due and owing by ACC to FHLIC.[3]

This was consistent with the recital or preamble paragraphs to the McClintock Fountains Deed of Trust, which also provided that all "rents, issues, profits" were given as further security for the payment of the indebtedness due and owing by ACC to FHLIC.[4]

County Recorder's Office, Phoenix, Arizona, at Recorder's Number 88–533985 against the Southern and Higley Parcel;

(b) Deed of Trust and Assignment of Rents recorded October 31, 1988 with the Maricopa County Recorder's Office, Phoenix, Arizona, at Recorder's Number 88–533987 against the Dobson and Chandler Parcel;

(c) Deed of Trust and Assignment of Rents recorded October 31, 1988 with the Maricopa County Recorder's Office, Phoenix, Arizona, at Recorder's Number 88–533989 against the McClintock Fountains Shopping Center (the "McClintock Fountains Deed of Trust");

(d) Deed of Trust and Assignment of Rents recorded October 31, 1988 with the Maricopa County Recorder's Office, Phoenix, Arizona, at Recorder's Number 88–533992 against the 34th Way and Bell Road Parcel;

(e) Deed of Trust and Assignment of Rents recorded on November 30, 1988, with the Maricopa County Recorder's Office, Phoenix, Arizona, at Recorder's Number 88–584455 against the Pecos and Alma School Parcel;

(f) Deed of Trust, Assignment of Rents and Financing Statement recorded on October 31, 1988 with the Clerk and Recorder of Jefferson County, Colorado, at Reception Number 88105625 against the Ridge at West Meadows Parcel;

(g) Deed of Trust, Assignment of Rents and Financing Statement recorded October 31, 1988 with the Clerk and Recorder of Jefferson County, Colorado, at Reception Number 88105622 against the Country West Parcel;

(h) Deed of Trust, Assignment of Rents and Financing Statement recorded October 31, 1988 with the Clerk and Recorder of El Paso County, Colorado, in Book 5570 at Page 949 against the Sable Chase Parcel.

3. McClintock Fountains Shopping Center was the only parcel of real property that was generating any rents. Paragraph 11 provides as follows:

Assignment of Rents. All existing and future rents, leases, issues and profits of the Trust Property or any part thereof are hereby assigned to Beneficiary *as further security* for the payment of indebtedness and performance of the obligations, covenants, promises and agreements secured hereby. When requested by Beneficiary from time to time, and within such time as Beneficiary may reasonably require, Trustor shall execute, deliver and record separate Lease Assignments covering any and of all of the leases that may affect any part or all of the Trust Property. Such separate Lease Assignments shall be in such form and contain such provisions as Beneficiary may in its discretion require and, without limiting the generality of the foregoing, may require any such tenant to subordinate the tenant's rights to the lien of this Deed of Trust. *Whether or not separate Lease Assignments are required by Beneficiary, Trustor hereby authorizes and directs the lessees, tenants and occupants of the Trust Property that, upon written notice from Beneficiary, all payments required under said leases, or in any way respecting same, shall be made directly to Beneficiary as they become due.* Trustor hereby relieves said lessees, tenants and occupants from any liability to Trustor by reason of said payments being made to Beneficiary. *Nevertheless, until Beneficiary notifies in writing said lessees, tenants and occupants to make such payments to Beneficiary, Trustor shall be entitled to collect all such rents and/or payments. Beneficiary is hereby authorized to give such notification in the event of any Event of Default by Trustor under paragraph 10 hereof.* [Emphasis Added.]

4. The Deed of Trust provides:

That trustor hereby grants, transfers and assigns to Trustee, its successors and assigns, in trust pursuant to this document and Arizona law, with power of sale, that property in the City of Tempe, County of Maricopa, State of Arizona, more particularly described in Exhibit "A" attached hereto and by this reference incorporated herein.

TOGETHER WITH all and singular the tenements, hereditaments, rights, rights-of-way, easements, privileges and appurtenances thereunto belonging, or in anywise appertaining (all as part of the premises hereby conveyed) which shall be deemed to include but not to be limited to (i) all rents, issues, profits, damages, royalties, revenue and benefits therefrom, subject, however, to any right, power and authority hereinafter given to and conferred upon Beneficiary to collect the same, ... [Page 1, First two preamble paragraphs]

IN TRUST, for the *purpose of securing:*
(a) Payment of the indebtedness evidenced by the Promissory Note dated October 31, 1988,

Therefore, there was no absolute assignment of the rents. For instance, if the indebtedness were repaid by ACC, the assignment of rents would be abrogated.[5] Moreover, ACC was able to use the rents until an event of default had occurred pursuant to the terms and conditions of the Deed of Trust.[6]

Pursuant to the terms of the Notes, on May 1, 1989, quarterly interest installments aggregating $750,000.00 were due and owing by ACC to FHLIC. This due date was subsequent to the filing of ACC's Chapter 11 petition. The aggregate sum of $750,000.00 was due, and not paid by ACC on May 1, 1989, as follows:

| ORIGINAL PRINCIPAL SUM: | MAY 1, 1989 INSTALLMENT |
|---|---|
| (A) $4,170,000.00 | $125,100.00 |
| (B) $3,750,000.00 | $112,500.00 |
| (C) $9,564,000.00 | $286,920.00 |
| (McClintock Fountains Note) | |
| (D) $2,700,000.00 | $ 81,000.00 |
| (E) $1,905,872.00 | $ 57,176.16 |
| (F) $1,537,222.00 | $ 46,116.66 |
| (G) $ 622,906.00 | $ 18,687.18 |
| (H) $ 750,000.00 | $ 22,500.00 |

Paragraph 6 of the McClintock Fountains Note provides:

6. DEFAULT

If Maker fails to pay any Quarterly Installment on its due date or fails to pay any other amount due under any Loan Document on its due date, or if (subject to the restrictions in Section 8.3 of the Loan Agreement)[7] any other Event of Default occurs under any of the Loan

(and any renewals or extensions or modifications thereof) in the principal sum of Nine Million Five Hundred Sixty–Four Thousand and No/100 Dollars ($9,564,000.00) [Emphasis Added.] [Page 3 of Deed of Trust.]
The indebtedness referred to is a portion of that due and owing by ACC to FHLIC.

5. For instance, Paragraph 34, Pages 19–20 of the Deed of Trust provides:
Reconveyance. Upon written request of Beneficiary stating that all sums secured hereby have been paid, and upon surrender this Deed of Trust and the Note to Trustee for cancellation and retention and upon payment by Trustor of its fees, Trustee shall reconvey, without warranty, the estate in the Trust Property then held by Trustee. The Grantee in such reconveyance may be designated and described as the "person or persons legally entitled thereto," or by other appropriate terms.

Documents which is not cured within the time required, or if Maker gives to the Holder notice of pre-payment as hereinafter set forth and fails to make the pre-payment in the manner and on the date specified, then and in any of such events, the full unpaid principal balance of this Note, in the Holder's sole discretion, shall at once become due and payable and the unpaid principal balance, together with all accrued and unpaid interest and any other amounts payable hereunder and under the Loan Documents, shall thereupon bear interest at the Default Interest Rate and the Holder may immediately pursue all remedies available at law or in equity under this Note and the Loan Documents. All amounts not paid when due, whether or not as a result of acceleration of the unpaid principal balance and whether or not the Holder has notified Maker of the occurrence of an Event of Default, shall bear interest at the Default Interest Rate and at such time as judgment is obtained for any amounts owing under this Note or under any of the Loan Documents, interest shall continue to accrue on the amount of the judgment, until it is paid, at the Default Interest Rate.

Paragraph 42 of the Deed of Trust provided that a default under one Deed of Trust or Loan Document (such as a Note) was a default under the other Notes and Deeds of Trust.[8]

6. In this matter, the "Trust Property" was a defined term, which included the rents generated on the property. See Paragraphs 10, 11, and 12, Pages 9–12 of the Deed of Trust concerning the use of rents until an event of default.

7. The parenthetical does not appear in the Promissory Note executed by Amcor Investment Corporation. Section 8.3 of the Loan Agreement is entitled "Restrictions on Cross–Default and Cross–Collateralization."

8. Paragraph 42 of the McClintock Fountains Deed of Trust reads as follows:
42. Cross–Default. Except as otherwise provided in Section 8.3 of the Loan Agreement: (a) a default hereunder shall, at Beneficiary's option, constitute a default under the Loan Agreement, under all other Loan Documents and under each of the Other Notes that are referred to in the Note, or such of them as Beneficiary shall elect in its sole discretion;

Since no default had occurred prepetition, FHLIC took no action pursuant to enforcement of the default provisions of the Notes or Deeds of Trust, including the assignment of rents provision, until after the filing of ACC's bankruptcy petition.

Because of the postpetition defaults in interest payments by ACC as of May 1, 1989 under all of the Notes, FHLIC now wants all of the net sales proceeds to be received by ACC, as well as the rents, to be applied to the outstanding amounts under the Notes.

## LEGAL ISSUES

I. WHETHER THE ASSIGNMENT OF RENTS CLAUSE IN THE DEED OF TRUST WAS ABSOLUTE OR GRANTED AS A SECURITY DEVICE.

II. WHETHER THE ATTACHMENT AND PERFECTION OF A SECURITY INTEREST IN RENTS GENERATED BY REAL PROPERTY IS GOVERNED BY THE UNIFORM COMMERCIAL CODE OR REAL PROPERTY LAW.

III. WHETHER THE LIEN CREATED IN RENTS AS A RESULT OF THE RECORDATION OF A DEED OF TRUST WITH AN ASSIGNMENT OF RENTS CLAUSE IS INCHOATE.

IV. WHETHER THE LIEN CREATED UNDER ARIZONA LAW IS WITHIN THE SCOPE OF SECTION 546(b) OF THE BANKRUPTCY CODE.

V. WHAT ACTION IS APPROPRIATE AFTER THE FILING OF THE BANKRUPTCY PETITION TO PERFECT A LIEN IN RENTAL PROCEEDS.

and (b) a default under the Loan Agreement, under any Loan Document or any Other Note shall, at Beneficiary's option, constitute a default under the Deed of Trust.

9. See *In re Ventura–Louise Properties*, 490 F.2d 1141 (9th Cir.1974), interpreting California law; *In re Matter of Stapp*, 641 F.2d 737 (9th Cir. 1981), interpreting Nevada law.

10. See Footnotes 3, 4, 5 and 6.

11. A.R.S. § 33–412 provides as follows:
   A. All bargains, sales and other conveyances whatever of lands, tenements and hereditaments, whether made for passing an estate

## DISCUSSION

### I

■ In determining the nature and extent of the Assignment of Rents Clause, this Court should note that generally when determining the rights of various parties in a debtor's assets, State law is applicable. *Butner v. U.S.*, 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979).

The particular Clause at issue is Paragraph 11 of the Deed of Trust. (See Footnote 3, *supra*, for the complete text of Paragraph 11).

Although an assignment of rents clause under State law may be absolute,[9] the Clause in this matter is not. First, the Deed of Trust states that the rents are given as security for the repayment of the indebtedness. Second, the assignment only remains in effect until the indebtedness is paid in full. Third, an event of default must occur to trigger the right of FHLIC to collect rent or take other action.[10]

Therefore, this Court concludes that the Assignment of Rents Clause was not absolute. The rents were given as further security. As such, an event of default must have necessarily occurred before FHLIC could proceed with enforcement procedures.

### II

Under Arizona law, the right to receive unaccrued rent on a real property lease is a real property transaction within the scope of A.R.S. § 33–412.[11]

of freehold or inheritance or an estate for a term of years, and deeds of settlement upon marriage, whether of land, money or other personal property, and deeds of trust and mortgages of whatever kind, shall be void as to creditors and subsequent purchasers for valuable consideration without notice, unless they are acknowledged and recorded in the office of the county recorder as required by law, or where record is not required, deposited and filed with the recorder.
   B. Such unrecorded instruments, as between the parties and their heirs, and as to all subsequent purchasers with notice thereof, or without valuable consideration, shall be valid and binding.

In *Valley National Bank v. Avco,* 14 Ariz.App. 56, 480 P.2d 671 (1971), the Court had to determine the effect of an unrecorded assignment of rents document.

Verner Land and Development Corporation ("Verner") had leased a portion of the Shopping Center that it owned to an oil company for the purpose of operating a service station. Verner was to construct a suitable building on the premises. Valley National Bank provided construction funding to Verner. In turn, in 1962, Verner granted Valley National Bank a security interest in the rents to be received from the oil company as security for the repayment of the indebtedness from Verner to the Bank. The assignment of rents document was executed on September 11, 1962, *but not recorded at the time.*

Subsequently, Verner sold the Shopping Center (including that portion containing the service station) to Laurel Crest, Inc. Laurel Crest obtained additional financing, and a mortgage was recorded against the real property. Laurel Crest defaulted on its payments to this subsequent mortgagee, a foreclosure action was commenced, a default judgment was obtained, and the real property was sold at a Sheriff's sale. The subsequent mortgagee was the successful bidder at the Sheriff's sale. *At this point,* Valley National Bank recorded its Assignment of Rents document.

The Court was asked to determine the exact nature of the assignment of the right to unaccrued rents on real property. The Court stated:

> Our research leads us to the conclusion that the right to rent to accrue on a lease of real property is an incorporeal hereditament that is an incident to an estate in land, the transfer of which is the transfer of an interest in realty. While there are some jurisdictions that hold that the right to unaccrued rent is a chose in action [citations omitted], this view is

contrary to the common law and is not controlling in Arizona....

> Under the common law the right to unaccrued rent on a lease of real property is an incorporeal hereditament which is an interest in land. It is an incident to the reversion held by the landlord which, until severed, is intrinsic in the value of the reversion. The severance of the right to future rent from the reversion changes the nature of that interest in land so fundamentally that to hold an assignment of the right to future rents by the holder of the reversion does not fall within the scope of the recording act would frustrate the purpose of that act.

*Id.* at 58–59, 480 P.2d at 673–74.

Therefore, to defeat the rights of subsequent encumbrancers or good faith purchasers, for value and without notice of the unrecorded transaction, the assignment of rents document was within the scope of A.R.S. 33–412 and required recordation.

The Court seems to imply, in *Valley National Bank v. Avco,* that if the Bank had recorded its assignment of rents in 1962, requisite notice would have been provided to the subsequent purchaser and encumbrancers for value, and the Bank might have had a paramount interest in the rents generated from the oil company lease.

■ It is equally clear that since the assignment of an interest in unaccrued rents generated by real property is a transaction within the parameters of the real property statutes, the Uniform Commercial Code is not applicable in determining the creation or perfection of an interest in real property rents.[12]

### III

In 1974, the Ninth Circuit rendered a decision, applying Arizona law, as to the nature of the mortgagee's interest in rents generated from real property. *Prudential Insurance Co. of Amer. v. Fifty Associ-*

---

**12.** Such a transaction is specifically exempted from the provisions of the Uniform Commercial Code. A.R.S. § 47–9104 provides:

This chapter does not apply:
... Except to the extent that provision is made for fixtures in § 47–9313, to the cre- ation or transfer of an interest in or lien on real estate, including a lease or rents thereunder;

.   .   .   .   .

*ates,* 503 F.2d 925 (9th Cir.1974). The Court noted that the mortgagee was not entitled to receive the rents generated from the mortgaged real property until a default had occurred under the mortgage *or* the commencement of a foreclosure proceeding. The Court then noted that "the mortgage lien on such rents ripens upon the appointment of a receiver." *Id.* at 929. The Court noted that the mortgage contained an assignment of rents clause, a provision for the appointment of a receiver, *and* a receiver had actually been appointed. Therefore, whether the assignment of rents clause was absolute or not was irrelevant. The appointment of the receiver had perfected the right of the mortgagee to rents. *Id.* at 929. The Court relied on *Wingfoot California Homes Co. v. Valley National Bank,* 74 Ariz. 287, 248 P.2d 738 (1952) for its holding. Both *Prudential Insurance* and *Wingfoot* were decided under prior Arizona law. *Prudential Insurance,* however, seems to imply that if an assignment of rents is given as security to repay an indebtedness, an inchoate lien is created at the recordation of the mortgage. Some affirmative action, such as the appointment of a receiver, is then necessary to perfect the mortgagee's interest in the rents.

However, neither the legal nor equitable interest in real property is transferred to the mortgagee. Thus, the mortgage only creates a lien. With respect to mortgages, Arizona is a lien-theory, not a title-theory State. *Fremming Const. Co. v. Security Sav. and Loan Ass'n,* 115 Ariz. 514, 566 P.2d 315 (Ct.App.1977); *Dart v. Western Sav. & Loan Ass'n,* 103 Ariz. 170, 438 P.2d 407 (1968); *Mortgage Investment Co. of El Paso, Tex. v. Taylor,* 49 Ariz. 558, 68 P.2d 340 (1937).

Arizona law has been amended, and now provides for the use of deeds of trust, as well as mortgages, in real property transactions. In a deed of trust, the owner of the land and the proposed borrower of funds transfers title to the real property to a Trustee, who holds the real property in trust for the beneficiary. The beneficiary is the lender; that is, the party that has provided the funds to the borrower. In this case, ACC was the owner of the land and the borrower, and FHLIC was the beneficiary and lender. First American Title Insurance Company of Arizona was the Trustee.

Although a mortgage is governed by A.R.S. §§ 33–701 *et seq.,* deeds of trust are governed by A.R.S. §§ 33–801 *et seq.*

In developing the statutory framework for deeds of trust, the Arizona legislature contemplated that in most cases, no Court action would be necessary to enforce the rights and remedies provided therein. The statutory framework for deeds of trust, for instance, sets forth a procedure as to the ability to sell the real property without Court intervention. The Statute provides what should be contained in any kind of notice that is utilized in selling the real property, and the precise procedure for determining when a party may, after notice, exercise the power of sale provisions to transfer the real property from the Trustee to the beneficiary. Because the statutory framework concerning deeds of trust does not necessarily contemplate Court intervention, it is unreasonable to assume that a party, *to perfect its security interest in rental proceeds,* must necessarily be bound by the appointment of a receiver or the request for an injunction.

Therefore, the statutory framework concerning deeds of trust provides a great deal of flexibility upon default. A lender may proceed with a Court action to foreclose a deed of trust as if it were a mortgage, or proceed with the notice of sale procedures without court intervention (A.R.S. § 33–807(A)).

Given this statutory framework, A.R.S. § 33–702(B) suddenly makes sense. This Section discusses the assignment of rents generated by real property in connection with a mortgage or deed of trust, and the enforcement of such an assignment. It provides:

B. A mortgage or trust deed may provide for an assignment to the mortgagee or beneficiary of the interest of the mortgagor or trustor in leases, rents, issues, profits or income from the property cov-

ered thereby, whether effective before, upon or after a default under such mortgage or trust deed or any contract secured thereby, and such assignment may be enforced without regard to the adequacy of the security or the solvency of the mortgagor or trustor by any one or more of the following methods:

1. The appointment of a receiver.

2. The mortgagee or beneficiary taking possession of the property, or without the mortgagee or beneficiary taking possession of the property.

3. Collecting such monies directly from the parties obligated for payment.

4. Injunction.

First, the Section clearly provides that an assignment of rents in either a mortgage or deed of trust may be effective *prior* to a default having occurred under the mortgage or deed of trust. *Therefore, if the underlying document between the borrower and the lender is so drafted, the assignment of rents may provide for an absolute transfer of all rents to the lender.* If the transfer is absolute, then recordation of the mortgage or deed of trust alone would be the only act required. *In re Ventura–Louise Properties,* 490 F.2d 1141 (9th Cir.1974); *In re Matter of Stapp,* 641 F.2d 737 (9th Cir.1981).

I have already concluded that the Assignment of Rents Clause in this matter was not absolute, but given as security.

FHLIC must first wait for an event of default to occur. The failure of ACC to pay the interest on the Notes on or about May 1, 1989, was clearly an event of default under Paragraph 10 of any of the Deeds of Trust. Upon the happening of the event of default, FHLIC, as beneficiary under the Deed of Trust was entitled to pursue any number of remedies. The remedies available to FHLIC included (if bankruptcy had not intervened):

(a) accelerating the indebtedness due and owing by ACC to FHLIC, and proceeding with the notice of sale procedures to sell the real property without Court intervention;

(b) accelerating the indebtedness, and proceeding with a foreclosure of the deed of trust as if it were a mortgage on real property;

(c) pursuing any of the rights and remedies provided by A.R.S. § 33–702;

(d) entering upon and taking possession of the real property;

(e) collecting and receiving all rents from the real property, including the right to collect and sue for any rents that are past due and unpaid.[13]

Therefore, once there was a default, FHLIC could simply notify a tenant of the Shopping Center to pay it, and not ACC, the rent being generated under a lease agreement between ACC and the tenant. This *notice* would be consistent with the Deed of Trust provisions. Moreover, A.R.S. § 33–702(B)(2) provides that FHLIC could enforce its Assignment of Rents Clause by "taking possession of the property, or without ... taking possession of the property." The mere *notice* would be sufficient and within the parameters of Section 33–702(B)(2), without actually *collecting* the rents as provided in A.R.S. § 33–702(B)(3).

A.R.S. § 33–702(B) is also phrased to permit alternative enforcement procedures. For instance, an Order providing for *sequestration of rents* would be within the scope of this Section.

However, A.R.S. § 33–702(B) refers to only *enforcement* procedures. If the assignment of rents clause is not absolute, but given as security, the issue remains when does the lien in the rents become perfected? This Court concludes that based upon prior case law concerning mortgages (as previously cited by this Court), coupled with the statutory framework concerning deeds of trust, this Court must require that the beneficiary (lender) under a deed of trust as to an assignment of rents clause given as security

(a) wait for an event of default to occur, and

**13.** See Pages 10, 11 and 12 of any of the Deeds of Trust.

(b) pursue some affirmative action to sequester, control, collect, or take possession of the rents.

It would also appear that there is a retroactive effect to the *lien*, but not to the *rents* received. For instance, under Arizona law, if a junior lienholder has a receiver appointed to collect rents, the receiver acts on behalf of the junior lienholder *until* the senior lienholder joins in the action and requests that the senior lienholder receive all rents. At such a point, the filing of the deed of trust *prior in time* permits the senior lienholder to defeat the rights of the junior lienholder to collect the rents from the real property. Although "perfection" of the senior lienholder's interest occurred subsequent to that of the junior lienholder, the "perfection" relates back to the original recordation of the senior lienholder's deed of trust permitting the senior lienholder to receive all of the *subsequently generated rents*. A.R.S. §§ 33–411(A), 33–412(A), 33–723, 33–805.

■ Therefore, under Arizona law, if the assignment of rents is not absolute, an event of default must occur, and some affirmative action must be taken to "perfect" an interest in rents or to change an "inchoate" lien into a "perfected" lien.

■ Finally, the lien in Arizona does have retroactive effect, in that a senior lienholder may enforce its interest in rents over that of a junior lienholder even though the junior lienholder has perfected its interest first.

## IV

In reviewing the Arizona Statutes, such as A.R.S. §§ 33–702(B), 33–411(A), 33–412(A), 33–723 and 33–805, this Court concludes that there is a relation-back theory concerning the perfection of a beneficiary's (lender's) *lien* in rent proceeds, which lien relates back to the time of the filing of the deed of trust. The date of the creation of the lien determines the priority of the party that is seeking to enforce its interest over parties that have subsequently encumbered the real property, as well as the rental proceeds.

This Court's analysis of the relation-back theory of the lien, once enforcement is pursued, was followed previously under Texas law. Texas law is similar to Arizona law, insofar as the enforcement of an interest in rental proceeds may be accomplished by the appointment of a receiver, actual possession of the rent proceeds by the mortgagee, *or* by similar action by the mortgagee. *In re Casbeer*, 793 F.2d 1436, 1442 (5th Cir.1986).

If this relation-back theory for a lien, upon the happening of a default and the taking of affirmative action concerning the rents, is applied to the factual situation concerning FHLIC, then Sections 552 and 546(b) of the Bankruptcy Code support the position that FHLIC has a perfected security interest in the rents generated from the McClintock Fountains Shopping Center.

The importance of Section 552 of the Bankruptcy Code cannot be underestimated. Section 552(b) of the Bankruptcy Code provides as follows:

(b) Except as provided in section 363, 506(c), 522, 544, 545, 547, and 548 of this title, if the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to proceeds, product, offspring, rents, or profits of such property, then such security interest extends to such proceeds, product, offspring, rents, or profits acquired by the estate after the commencement of the case to the extent provided by such security agreement and by applicable non-bankruptcy law, except to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise.

This particular Section describes in detail the post-petition effect of a security interest obtained by a creditor prepetition. The Section explicitly states that if the security interest is obtained in property prepetition, that security interest extends to all rents acquired by the estate after the bankruptcy petition is filed.

In turn, Section 546(b) of the Code provides:

> (b) The rights and powers of a trustee under sections 544, 545, and 549 of this title are subject to any generally applicable law that permits perfection of an interest in property to be effective against an entity that acquires rights in such property before the date of such perfection. If such law requires seizure of such property or commencement of an action to accomplish such perfection, and such property has not been seized or such action has not been commenced before the date of the filing of the petition, such interest in such property shall be perfected by notice within the time fixed by such law for such seizure or commencement.

■ Once FHLIC chose to take affirmative action after an event of default had occurred under the Deed of Trust, the lien in the rents was perfected and related back to the filing of the Deed of Trust. However, because A.R.S. 33–702(B) is an *enforcement* provision, FHLIC's *entitlement to rents* was only from the date of the affirmative action taken by it to the present date.

This distinction between obtaining a "perfected" lien on the *interest* in rents and the actual entitlement to the *receipt* of rents is discussed in *Casbeer.*

> The perfection of those interests relates back to a time before bankruptcy for the purpose of § 546(b); perfection does not relate back to a time before bankruptcy for the purpose of entitlement to rents. To allow otherwise would authorize the collection of pre-petition rentals, a result clearly at odds with *Taylor v. Brennan,*

621 S.W.2d [592] at 594 [Tex.1981], and the warning in *Butner v. United States,* 440 U.S. at 55, 99 S.Ct. at 918 (quoting *Lewis v. Manufacturers Nat'l Bank,* 364 U.S. 603, 609, 81 S.Ct. 347, 350, 5 L.Ed.2d 323 (1961)), that a party should not receive 'a windfall merely by reason of the happenstance of bankruptcy.' For these reasons, the district court erred to the extent that it concluded that post-petition rentals from a given property that accrued before State Savings perfected its interest in the rentals from that property represented cash collateral under § 363(a).

*In re Casbeer,* 793 F.2d at 1443–1444.

This Court's determination of FHLIC's interest in rental proceeds and the date of its entitlement to rental proceeds does not permit FHLIC to obtain greater rights than a beneficiary (lender) currently has under Arizona real property law.

Even if the lien in Arizona concerning an interest in unaccrued rental proceeds does not relate back to the time of the filing of the deed of trust,[14] this Court believes that there is additional authority under the case law that supports the position of FHLIC that they have a perfected security interest in rental proceeds postpetition. This separate line of case authority indicates that a party is still entitled to the benefits under Section 546(b) of the Bankruptcy Code to the extent that the state law affords such a secured creditor priority under applicable state law, or for other equitable reasons. These cases do not rely on a specific finding under state law that the perfection of the interest in the rental proceeds must relate back to the time period prior to the filing of the bankruptcy petition.[15]

---

**14.** In reviewing the decisions of the various Bankruptcy Courts and Appellate Courts, it would appear that one line of case authority requires that for Section 546(b) of the Bankruptcy Code to be applicable, the State law must apply the relationback theory. The decisions which have come to this conclusion as to the Section 546(b) may be set forth as follows:

> *In re Casbeer,* 793 F.2d 1436, 1443 (5th Cir. 1986); *In re Association Center Limited Partnership,* 87 B.R. 142, 146 (Bankr.W.D.Wash. 1988); *In re Prichard Plaza Assoc. Limited Partnership,* 84 B.R. 289, 301 (Bankr.D.Mass.

1988); *Matter of A.W.H. of Wisconsin, Inc., (Leben v. Rabin),* 70 B.R. 546 (Bankr.E.D.Wis. 1987); *In re Winzenburg,* 61 B.R. 141 (Bankr. N.D.Iowa 1986); *In re Gotta,* 47 B.R. 198, 202 (Bankr.W.D.Wis.1985).

**15.** The cases which follow this line of authority are as follows:

> *In re Consolidated Capital,* 47 B.R. 1008, 1011 (D.Colo.1985) affirming 46 B.R. 510 (Bankr.D. Colo.1984); *In re Gelwicks,* 81 B.R. 445, 448 (Bankr.D.Ill.1987); *In re Morning Star Ranch Resorts,* 64 B.R. 818 (Bankr.D.Colo.1986); *In re Sampson,* 57 B.R. 304, 307 (Bankr.D.Tenn.

In fact, the decision of *Saline State Bank v. Mahlock,* 834 F.2d 690 (8th Cir. 1987), specifically discusses the situation where a party has an inchoate lien both prior to the commencement of the bankruptcy proceeding, as well as after the filing of the bankruptcy petition. In *Saline,* the debtor defaulted under the applicable mortgage or deed of trust after the filing of the bankruptcy petition. The Court believed that it must, from an equitable standpoint, determine the rights and remedies of the various parties in the rental proceeds postpetition. The Eighth Circuit stated that sequestration, even though the default occurred postpetition, was appropriate. Therefore, the Eighth Circuit determined that equitable principles should be applied, and that the secured creditor should be entitled to the same rights and benefits that said creditor would receive under State law, irrespective of the filing of the bankruptcy petition.

This Court believes that the statutory framework in Arizona is within the contemplation of Section 546(b). To hold otherwise would be to totally vitiate the notice provisions of Arizona law providing that recorded instruments as to real property have priority over subsequent *bona fide* purchasers and subsequent encumbrancers for value as provided under A.R.S. § 33-412. In addition, the enforcement mechanism as to the presently existing liens in rental proceeds would make no sense, when read in conjunction with the notice provisions, unless the Arizona statutory provisions were contemplated as being within Section 546(b) of the Code. Certainly, once enforcement procedures are begun under Arizona law, the beneficiary (lender) under a deed of trust is given priority over the debtor to receive the rental proceeds.

Since the applicable Arizona Statute is within the parameters of Section 546(b) of the Code, then the automatic stay of Section 362(a) of the Bankruptcy Code is inapplicable to the transaction. Indeed, Section 362(b)(3) specifically provides that a party may take action pursuant to Section 546(b) of the Bankruptcy Code to perfect its security interest, and said action will not be in violation of the automatic stay. Therefore, this Court's analysis of the applicable Arizona law reflects that Section 546(b) is clearly available to a beneficiary under a deed of trust, provided that a default has occurred, and the beneficiary has taken appropriate steps under Arizona law to enforce its interest in the rental proceeds.

V

■ Based upon *In re Johnson,* 62 B.R. 24 (9th Cir. BAP 1986), this Court concludes that a filing of a motion to vacate the stay in a bankruptcy proceeding is not consistent with what is required under State law to perfect a security interest in rental proceeds. Arizona law, specifically A.R.S. Section 33-702(B), provides that enforcement by a beneficiary, in and to rental proceeds, may be accomplished without necessarily the appointment of a receiver, the obtainment of an injunction, or the beneficiary specifically directing that the rental proceeds be directed to it. The beneficiary may, in addition, take possession of the property, or enforce its interest in the rental proceeds without taking possession of the property. Therefore, this Court concludes that under the applicable Arizona Statute, a beneficiary of a deed of trust is given a great deal of flexibility or latitude in enforcing its security interest in rental proceeds. Again, however, Arizona law seems to require that if there is no absolute assignment of rents clause, there must be an underlying default in the loan documentation or the deed of trust *and* some affirmative action following the default must be taken under Arizona law.

In this Court's review of *Butner v. U.S.,* 440 U.S. 48, 99 S.Ct. 914; *In re Johnson,* 62 B.R. 24; and *In the Matter of Village Properties,* 723 F.2d 441 (5th Cir.1984), a sequestration of the rental proceeds is mentioned as the most appropriate action to be taken by a secured creditor to enforce its rights in rental proceeds once a bankruptcy petition has been filed. In the context of this proceeding, it would appear that these decisions *require* a motion to

1986); *In re Fluge,* 57 B.R. 451 (Bankr.D.N.D. 1985).

prohibit the use of or sequester cash collateral. At a hearing on such a motion, the Court may determine which party, the secured creditor or the debtor, is entitled to receive the rental proceeds. This affirmative action by the Bankruptcy Court is apparently required irrespective of Bankruptcy Code Section 363, subsections (a) and (c)(2) thereunder, concerning the use of cash collateral.[16] Section 363 appears to require that the Debtor take some affirmative action if cash collateral is involved before the Debtor may use same. However, the *Johnson, Butner,* and *Village Properties* decisions stand for the proposition that unless a secured creditor takes affirmative action in the Bankruptcy Court first to sequester rental proceeds, Section 363 of the Code is not applicable.

This Court believes that, initially, if a secured creditor files a notice of objection to the use of cash collateral or a notice of perfection in cash collateral, the secured creditor has obtained a perfected security interest in the rental proceeds pursuant to Arizona law. However, obtaining a perfected security interest in the rental proceeds is not the end of the inquiry. If the secured creditor does not wish to be deemed to have impliedly consented to the debtor's use of cash collateral, on even an interim basis, the secured creditor, to be consistent with the *Johnson, Butner* and *Village Properties* decisions, should also file a motion for sequestration of cash collateral or to prohibit the use of cash collateral. The filing of such a motion, in turn, requires the debtor to file a motion to use cash collateral. Presumably, the Court would then, at one hearing, address the issue as to whether the debtor may use cash collateral.

As to FHLIC, ACC did not default under the McClintock Fountains Note or Deed of Trust until May 1, 1989. On May 2, 1989, FHLIC filed its Motion to Prohibit the Use of Cash Collateral. Therefore, on May 2, 1989, FHLIC obtained a perfected security interest in all rental proceeds generated by the McClintock Fountains Shopping Center. On May 2, 1989, the applicable enforcement procedures under A.R.S. § 33–702(B) had been effectuated. Because FHLIC had filed a Motion to Prohibit the Use of Cash Collateral on May 2, 1989, the Debtor was prohibited from that date forward from using the rental proceeds, then constituting cash collateral under Bankruptcy Code Section 363(a), without first filing a Motion to Use Cash Collateral. Therefore,

IT IS ORDERED that FHLIC obtained a perfected security interest in the rental proceeds of McClintock Fountains Shopping Center as of May 2, 1989.

IT IS FURTHER ORDERED that any rental proceeds received by ACC and placed in its deposit account *prior* to May 2, 1989, may be used by ACC in the ordinary course of its business operations.

---

**16.** Bankruptcy Code § 363 provides:

(a) In this section, "cash collateral" means cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring, rents, or profits of property subject to a security interest as provided in section 552(b) of this title, whether existing before or after the commencement of a case under this title.

.   .   .   .   .

(c)(2) The trustee may not use, sell, or lease cash collateral under paragraph (1) of this subsection unless—

(A) each entity that has an interest in such cash collateral consents; or

(B) the court, after notice and hearing, authorizes such use, sale, or lease in accordance with the provision of this section.